### UNITED STATES of America

v.

### Albert W. COACHMAN, Appellant.

### No. 81–2301.

United States Court of Appeals, District of Columbia Circuit.

Argued June 3, 1982.

Decided Feb. 24, 1984.

As Amended March 9, 1984.

1294

SPOTTSWOOD W. ROBINSON, III, Chief Judge.

After trial by a jury, Albert W. Coachman was found guilty on 54 counts—18 each of mail fraud,[1] theft of Government property,[2] and false claims against the Government.[3] He was sentenced to concurrent terms of imprisonment for five years on each of the counts of mail fraud and theft, and to concurrent terms of three years on each of the counts of false claims, the three-year sentences to be served consecutively to those for five years.[4] Coachman attacks the convictions on grounds that evidence was erroneously admitted and then was improperly shielded from impeachment. Additionally, he claims that the Double Jeopardy Clause of the Fifth Amendment[5] barred any consecutiveness in the sentences. We reject Coachman's evidentiary challenges and find the sentences permissible.

I

As a clerk in the Finance and Accounting Office of the Military District of Washington, Coachman serviced the payroll of the Defense Intelligence Agency (DIA). In this role he established accounts for new employees, adjusted individual payroll records, and closed accounts of terminated employees. These activities required Coachman to prepare computer documents calling for salary payments to employees and computer records of changes made in the payroll.

In the course of a routine audit, investigators detected discrepancies in the DIA payroll. The audit revealed that five individuals receiving DIA pay checks were not DIA employees, and that the agency lacked records authorizing their placement on the payroll. DIA then examined all documents

Larry J. Ritchie, Washington, D.C., for appellant.

Katherine Winfree, Asst. U.S. Atty., Washington, D.C., with whom John A. Terry, Asst. U.S. Atty., at time brief was filed, Washington, D.C., and Stanley S. Harris, U.S. Atty., at time brief was filed, Washington, D.C., were on brief, for appellee. John R. Fisher and Charles H. Roistacher, Asst. U.S. Attys., Washington, D.C., also entered appearances for appellee.

Before ROBINSON, Chief Judge, WALD, Circuit Judge, and SWYGERT,* Senior Circuit Judge.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

---

* Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

1. In violation of 18 U.S.C. § 1341 (1982).

2. In violation of 18 U.S.C. § 641 (1982).

3. In violation of 18 U.S.C. § 287 (1982).

4. The sentencing order also imposed a $5,000 fine generally.

5. U.S. Const. amend. V.

submitted for the payroll during the following two pay periods, and found computer-generated forms, bearing Coachman's initials and payroll number, directing preparation and mailing of pay checks to the five non-employees. Further investigation unearthed 34 such checks issued on Coachman's instructions, of which 31 had been mailed and later paid on presentment, with a resulting loss of about $38,000 to the Government.

The indictment against Coachman charged a scheme to defraud the Government. It alleged that Coachman, without authority, placed the names of the five non-employees on the DIA payroll, and periodically submitted paperwork falsely representing that they were entitled to salary payments. The indictment averred that Coachman thus caused pay checks to be distributed through the mails to these non-employees and cashed by them, and that he shared the proceeds of the checks with the payees. The indictment theorized mail fraud through mailing of the ill-gotten checks, false claims against the Government through their presentment for payment, and theft from the Government through their cashing.

At trial, the Government called a number of witnesses and introduced numerous exhibits into evidence. Coachman offered no evidence and was convicted on all counts. Coachman challenges the handling of an item of the Government's proof and raises the specter of a double jeopardy violation through consecutive sentencing.

## II

The evidentiary issue centers on the introduction of a confession by one Gary Bal-

lard, who was separately indicted as a participant in the criminal plot. Pursuant to a plea bargain prior to Coachman's trial, Ballard pleaded guilty to a single count of false claims against the Government. When called by the Government as a witness against Coachman, however, Ballard refused to answer any questions. The Government then offered, and was permitted to place in evidence, a Secret Service agent's recapitulation of an inculpatory statement made by Ballard after his arrest.

■ Coachman argues that Ballard's confession did not qualify as a declaration against interest and therefore was inadmissible hearsay. We are satisfied that the confession was not vulnerable on that ground. Rule of Evidence 804(b)(3)[6] rejects the common law requirement that the interest declared against be pecuniary or proprietary in nature, and extended the hearsay exception for such declarations to other types of self-damaging statements by an unavailable declarant, including one "which . . . at the time of its making so far . . . tended to subject him to . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."[7] Ballard's confession plainly was of that character, and his refusal to testify concerning it rendered him unavailable for purposes of the rule.[8]

■ Whether a statement is in fact against interest depends upon the circumstance of the particular case.[9] We are mindful of the Advisory Committee's warning that an in-custody statement which inculpates another as well as the speaker may have been made with a view to currying favor with law-enforcement authorities,

---

**6.** Fed.R.Evid. 804(b)(3).

**7.** *Id.* When, however, the inculpatory statement is "offered to exculpate the accused," it "is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.* See also Fed.R.Evid. 804(b)(3) advisory committee note, para. 3; H.R.Rep. No. 93–650, 93rd Cong., 1st Sess. 16–17 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7075, 7089–7090; S.Rep. No. 93–1277, 93rd Cong., 2d Sess. 21–22 (1974), *re-*

*printed in* 1974 U.S.Code Cong. & Ad.News 7051, 7068; H.R.Rep. No. 93–1597 (conference report), 93rd Cong., 2d Sess. 12 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7098, 7105–7106.

**8.** Fed.R.Evid. 804(a)(2).

**9.** Fed.R.Evid. 804(b)(3) advisory committee note, para. 4.

and consequently might not qualify as a declaration against penal interest.[10] Here, however, Ballard's version did not attempt to trivialize his own involvement in the nefarious scheme by shifting responsibility to his cohorts; rather, it frankly disclosed the extent of his own participation without any effort to demonstrate that others were really the ones to blame. Moreover, other evidence—such as verification of Ballard's endorsement on fraudulently-obtained payroll checks, and tracing of several contemporaneous money orders and a personal check from Ballard into Coachman's bank account—tended strongly to corroborate Ballard's confession.

■ However, for the very reason that Ballard's statement incriminated not only Ballard himself but Coachman as well, an entirely different problem is encountered. Admission of the confession where Ballard, because of his refusal to testify, was unavailable for cross-examination, deprived Coachman of the benefit of the Confronta-

tion Clause of the Sixth Amendment.[11] The case fell squarely within the Supreme Court's *Bruton* holding,[12] and Ballard's confession should not have been received in evidence.[13]

■ Nonetheless, this error does not warrant reversal of Coachman's convictions. The record is replete with properly admitted evidence, both physical and testimonial, of Coachman's deep involvement in the criminal enterprise. Moreover, as we have noted, Coachman made no effort whatsoever to rebut the Government's proof in any wise. We thus are led to believe that "the 'minds of an average jury' would not have found the [Government's] case significantly less persuasive had the testimony as to [Ballard's] admissions been excluded."[14] By our estimate, "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of [Ballard's] admission[s] is so insignificant by comparison, that it is clear beyond a reasonable doubt that the

---

**10.** See *id.*

**11.** U.S. Const. amend. VI.

**12.** *Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476, 479 (1968) (admission against defendant in joint criminal trial of his confession also inculpating his co-defendant violates the latter's rights under Confrontation Clause, despite instruction undertaking to limit jury's consideration of confession to confessing defendant); *cf. Parker v. Randolph,* 442 U.S. 62, 75, 99 S.Ct. 2132, 2140, 60 L.Ed.2d 713, 724–725 (1979) (plurality opinion) (suggesting that *Bruton* problem does not arise when interlocking confession by defendant himself has been properly admitted). *United States v. Leonard,* 161 U.S.App.D.C. 36, 494 F.2d 955 (1974), is to be distinguished. There we deemed admissible several statements made by a nontestifying defendant during the commission of the crimes charged, even though the statements incriminated the declarant's co-defendants. *Id.* at 49–51, 494 F.2d at 968–970. We pointed out that, unlike the confession in *Bruton,* the statements were admissible against all defendants under the hearsay-rule exception for contemporaneous utterances, and that *Bruton* disavowed any view on a situation of that sort. *Id.* at 50, 494 F.2d at 969. See *Bruton v. United States, supra,* 391 U.S. at 126, 88 S.Ct. at 1622, 20 L.Ed.2d at 479. The federal evidentiary rule incorporating the hearsay exception for statements against interests does not render

Ballard's confession admissible, for the rule "does not purport to deal with questions of the right of confrontation." Fed.R.Evid. 804(b)(3) advisory committee note, para. 4. See, to the same effect, S.Rep. No. 93–1277, 93rd Cong., 2d Sess. 21–22 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7051, 7068; H.R.Rep. No. 93–1597 (conference report), 93rd Cong., 2d Sess. 12 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7098, 7105–7106.

**13.** Coachman also claims that he was erroneously prevented from impeaching the confession by Ballard's criminal record. Even had the confession been admissible against Coachman, he undoubtedly would have been entitled to undertake an attack on Ballard's credibility by suitable proof of prior convictions. Fed.R. Evid. 609, 806. As even the Government apparently concedes, at minimum Ballard's recent conviction for making false claims against the Government would have been readily available for such an effort.

**14.** *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340, 345 (1972), quoting *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284, 288 (1969). See also *Brown v. United States,* 411 U.S. 223, 230–232, 93 S.Ct. 1565, 1570–1571, 36 L.Ed.2d 208, 215 (1973); *Harrington v. California, supra,* 395 U.S. at 254, 89 S.Ct. at 1728, 23 L.Ed.2d at 287.

improper use of the admission[s] was harmless error." [15]

## III

■ Coachman also contends that the District Court's imposition of consecutive sentences on the counts charging theft of Government property and false claims against the Government transgressed the Double Jeopardy Clause.[16] He asserts that, in these 18 instances of consecutiveness, he is being punished twice for the false claims violations because, he says, each was a lesser-included offense of a theft violation for which he was convicted. We thus are brought to consider the methodology for determining whether this particular combination of consecutive sentences for Coach-

man's factually-related misdeeds constitutes impermissible multiple punishments.

Indubitably, the Double Jeopardy Clause sets a limit on cumulation of punishments for criminal behavior.[17] Since, however, the power to define crimes and dictate punishments for their commission is wholly legislative,[18] and is not confined to prescription of a single punishment for a single crime,[19] "the question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishment the Legislative Branch has authorized." [20] As recently described by the Supreme Court,

> "[w]here consecutive sentences are imposed at a single criminal trial, the role of

---

**15.** *Schneble v. Florida, supra* note 14, 405 U.S. at 430, 92 S.Ct. at 1059, 31 L.Ed.2d at 344.

**16.** See notes 1–4 *supra* and accompanying text. Coachman also attacks the consecutiveness of the sentences imposed on the counts of mail fraud and false claims, but, as we understand, solely on the ground that the Double Jeopardy Clause prohibits multiple punishments for activities comprising a single criminal scheme although they are violative of more than a single statutory provision. The same argument, of course, could be used to challenge the consecutive sentences levied on the theft and false claims counts. The Supreme Court has repudiated Coachman's proposition as a per se rule, however, and teaches that the question is one of legislative intent, to be ascertained by the usual methodology. *Albernaz v. United States,* 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275, 284–285 (1981) (single agreement to both import and distribute marijuana, in violation of 21 U.S.C. §§ 846, 963 (1982)). See also *Gore v. United States,* 357 U.S. 386, 388–391, 78 S.Ct. 1280, 1282–1284, 2 L.Ed.2d 1405, 1407–1410 (1958); *American Tobacco Co. v. United States,* 328 U.S. 781, 788–789, 66 S.Ct. 1125, 1128–1129, 90 L.Ed. 1575, 1582–1583 (1946). But see *Braverman v. United States,* 317 U.S. 49, 54, 63 S.Ct. 99, 102, 87 L.Ed. 23, 28–29 (1942) (single continuing agreement, though having multiple objectives, violative of but a single statute). We later investigate the congressional intent inspiring the mail fraud statute. See note 43 *infra.*

**17.** The Double Jeopardy Clause specifies that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." The Supreme Court has declared that this provision erects three separate safeguards: it "protects against a second prosecution for the same offense after acquittal. It protects

against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656, 664–665 (1969). See *Albernaz v. United States, supra* note 16, 450 U.S. at 343, 101 S.Ct. at 1145, 67 L.Ed.2d at 284; *Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977) (*per curiam*); *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *United States v. Wilson,* 420 U.S. 332, 343, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232, 241 (1975). See also *United States v. Henry,* 661 F.2d 894, 896 (5th Cir. 1981), *cert. denied,* 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982); *United States v. Ward,* 696 F.2d 1315, 1319 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983). Coachman invokes only the third protection—that against multiple punishments for the same offense.

**18.** *E.g., Albernaz v. United States, supra* note 16, 450 U.S. at 344, 101 S.Ct. at 1145, 67 L.Ed.2d at 284–285, quoting *Whalen v. United States,* 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715, 722 (1980).

**19.** *Missouri v. Hunter,* —— U.S. ——, ——, 103 S.Ct. 673, 679, 74 L.Ed.2d 535, 544 (1983) (cumulative punishments possible under two statutes when specifically authorized by legislature, whether or not the two statutes criminalize the "same" conduct under *Blockburger* test).

**20.** *Albernaz v. United States, supra* note 16, 450 U.S. at 344, 101 S.Ct. at 1145, 67 L.Ed.2d at 284–285, quoting *Whalen v. United States, supra* note 18, 445 U.S. at 688, 100 S.Ct. at 1436, 63 L.Ed.2d at 721.

the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." ... Thus, the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed. Where Congress intended ... to impose multiple punishments, imposition of such sentences does ·not violate the Constitution.[21]

■ The Court has also sketched a multi-step analytical process by which judges may determine whether the legislature meant to authorize cumulative punishments for conduct infringing two or more separate statutory provisions. The court should first resort to the language of each provision for possible explanation of how the punishments it prescribes relate to those authorized by the other.[22] If the provisions are silent or ambiguous on the interaction of punishments, the court should explore the legislative history of each section for legislative intent respecting multiple punishments.[23] Should the legislative design remain obscure, the court should then invoke the judicially-fashioned *Blockburger* standard[24] in a continuing effort to ascertain the legislative will:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact the other does not.[25]

21. *Albernaz v. United States, supra* note 16, 450 U.S. at 344, 101 S.Ct. at 1145, 67 L.Ed.2d at 285, quoting *Brown v. Ohio, supra* note 17, 432 U.S. at 165, 97 S.Ct. at 2225, 53 L.Ed.2d at 194 (citations and footnote omitted).

22. The "starting point must be the language of the statutes," *Albernaz v. United States, supra* note 16, 450 U.S. at 336, 101 S.Ct. at 1141, 67 L.Ed.2d at 280, and "[a]bsent a 'clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *Id.,* 101 S.Ct. at 1141, 67 L.Ed.2d at 280, quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766, 772 (1980).

23. See *Missouri v. Hunter, supra* note 19, —— U.S. at ——, 103 S.Ct. at 679, 74 L.Ed.2d at 543; *Albernaz v. United States, supra* note 16, 450 U.S. at 340–342, 101 S.Ct. at 1142–1144, 67 L.Ed.2d at 282–284; *Simpson v. United States,* 435 U.S. 6, 13–14, 98 S.Ct. 909, 913–914, 55 L.Ed.2d 70, 77–78 (1978).

24. *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

25. *Id.* at 304, 52 S.Ct. at 182, 76 L.Ed. at 309. See, *e.g., Missouri v. Hunter, supra* note 19, —— U.S. at ——, 103 S.Ct. at 678, 74 L.Ed.2d at 542; *Albernaz v. United States, supra* note 16, 450 U.S. at 337, 101 S.Ct. at 1141, 67 L.Ed.2d at 280; *Illinois v. Vitale,* 447 U.S. 410, 416, 100 S.Ct. 2260, 2265, 65 L.Ed.2d 228, 235 (1980); *Whalen v. United States, supra* note 18, 445 U.S. at 692, 100 S.Ct. at 1438, 63 L.Ed.2d at 724. *Blockburger* is a "test for determining 'whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment.'" *Simpson v. United States,*

*supra* note 23, 435 U.S. at 11, 98 S.Ct. at 912, 55 L.Ed.2d at 75, quoting *Brown v. Ohio, supra* note 17, 432 U.S. at 166, 97 S.Ct. at 2225, 53 L.Ed.2d at 194. The Supreme Court has stressed that *Blockburger* is a rule of construction, serving merely "as a means of discerning congressional purpose." *Albernaz v. United States, supra* note 16, 450 U.S. at 340, 101 S.Ct. at 1143, 67 L.Ed.2d at 282. See also *Missouri v. Hunter, supra* note 19, —— U.S. at ——, 103 S.Ct. at 678–679, 74 L.Ed.2d at 542–543; *Whalen v. United States, supra* note 18, 445 U.S. at 691–692, 100 S.Ct. at 1437–1438, 63 L.Ed.2d at 723–724. Consequently, it does not override "a clear indication of contrary legislative intent," *Missouri v. Hunter, supra* note 19, —— U.S. at ——, 103 S.Ct. at 678–679, 74 L.Ed.2d at 543, quoting *Albernaz v. United States, supra* note 16, 450 U.S. at 340, 101 S.Ct. at 1143, 67 L.Ed.2d at 282; see also *Whalen v. United States, supra* note 18, 445 U.S. at 693, 100 S.Ct. at 1438, 63 L.Ed.2d at 724–725, and does not even come into play if that intent otherwise appears. *Missouri v. Hunter, supra* note 19, —— U.S. at ——, 103 S.Ct. at 679, 74 L.Ed.2d at 544; *Simpson v. United States, supra* note 23, 435 U.S. at 11–12, 98 ˙S.Ct. at 912–913, 55 L.Ed.2d at 76; *United States v. Lurz,* 666 F.2d 69, 76–77 (4th Cir.1981), *cert. denied,* 459 U.S. 843, 103 S.Ct. 95, 74 L.Ed.2d 87 (1982) (no occasion to employ *Blockburger* when terms of statute make it clear that Congress intended to allow cumulative punishments); *Pandelli v. United States,* 635 F.2d 533, 536 (6th Cir.1980) ("[t]he *Blockburger* test ... comes into play only after other techniques of statutory construction have proved to be inconclusive"); *United States v. Greschner,* 647 F.2d 740, 744 (7th Cir.1981) (looking to legislative intent before applying *Blockburger* ).

If, but only if, these techniques fail to reveal the legislative intent, the court should invoke the settled rule that ambiguity concerning the ambit of a criminal statute "should be resolved in favor of lenity."[26]

We turn, then, to determine, advertently to these principles, whether Congress intended to make the cashing of a fraudulently-obtained United States Treasury check punishable both as the presentation of a false claim—here, the check—for payment by the Government, and as a theft from the Government through acquisition of the proceeds of the check.

We begin with an examination of the statutory language defining the offenses of false claims upon and theft from the Government. In relevant part the false claims section reads:

Whoever makes or presents to any person or officer in the civil . . . service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent,

shall be fined not more than $10,000 or imprisoned not more than five years, or both.[27]

The pertinent portion of the theft section provides:

Whoever . . . steals, purloins, or knowingly converts to his use or the use of another, . . . any . . . money, or thing of value of the United States or of any department or agency thereof, . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.[28]

We note at the outset that these two provisions appear in different chapters of the federal criminal code, and that facially they define independent crimes carrying separate penalties. While these formats are some indication of a purpose to create separately-punishable offenses,[29] the statutory texts do not themselves shed significant light on the question whether Congress envisioned consecutive sentences for conduct trespassing upon each. Similarly, though unfortunately, the legislative history supplies no insight into the problem.[30]

26. *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199, 205 (1958). The policy of lenity "is a principle of statutory construction which applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose." *Albernaz v. United States, supra* note 16, 450 U.S. at 342, 101 S.Ct. at 1144, 67 L.Ed.2d at 283–284. See also *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205, 211 (1980). It "means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Ladner v. United States, supra,* 358 U.S. at 178, 79 S.Ct. at 214, 3 L.Ed.2d at 205. Thus, "if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses." *Bell v. United States,* 349 U.S. 81, 84, 75 S.Ct. 620, 622, 99 L.Ed. 905, 910–911 (1955). See also *Whalen v. United States, supra* note 18, 445 U.S. at 695 n. 10, 100 S.Ct. at 1439 n. 10, 63 L.Ed.2d at 726 n. 10. However, the " 'touchstone' of the rule of lenity 'is statutory ambiguity,' " *Albernaz v. United States, supra* note 16, 450 U.S. at 342, 101 S.Ct. at 1144, 67 L.Ed.2d at 283–284, quoting *Bifulco v. United States, supra,* 447 U.S. at 387, 100 S.Ct. at 2252, 65 L.Ed.2d at 211, and "[t]he rule

comes into operation 'at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.' " *Albernaz v. United States, supra* note 16, 450 U.S. at 342, 101 S.Ct. at 1144, 67 L.Ed.2d at 283–284, quoting *Callanan v. United States,* 364 U.S. 587, 596, 81 S.Ct. 321, 326–327, 5 L.Ed.2d 312, 318–319 (1961).

27. 18 U.S.C. § 287 (1982).

28. *Id.* § 641.

29. Compare *Albernaz v. United States, supra* note 16, 450 U.S. at 336, 101 S.Ct. at 1141, 67 L.Ed.2d at 280.

30. In its original state, the substance of the false claims and theft sections appeared in several provisions, all enacted nearly three-quarters of a century ago. See Act of March 4, 1909, ch. 321, §§ 35, 36, 47, 48, 35 Stat. 1095, 1096–1098. The two sections assumed their present form in the 1948 revision of Title 18 of the United States Code. Act of June 25, 1948, Pub.L. No. 80–772, 62 Stat. 698, 725. The House Report states that the Judiciary Committee, in examining Title 18, had discovered "[m]any inconsistencies in punishments," H.R. Rep. No. 304, 80th Cong., 1st Sess. 7 (1947),

Consequently, in our quest for congressional intent respecting cumulative punishment under these sections, we must resort to the *Blockburger* test: "whether each provision requires proof of a fact the other does not." [31]

Coachman contends that, in applying this test, we should look, not to the statutorily-specified elements of the offenses, but rather to the facts of the case as alleged in the indictment and established by the evidence. When this is done it is seen, he says, that the false claiming which the Government averred and proved was also the very action that made possible the thefts. Both the indictment and the trial evidence portrayed a scenario in which Coachman violated the theft statute by causing the issuance of pay checks to non-employees, the mailing of those checks to the payees, the presentment of the claims represented by the checks for payment, and the cashing of the checks and the distribution of the proceeds. And with the false claims counts cast as they were, the jury could not have convicted Coachman of that offense without finding that he caused the same pay checks to be fraudulently obtained and presented for payment.

Coachman thus concludes that there was no fact essential to demonstration of false claims that was not also an indispensable ingredient of the thefts, and that accordingly the false claims violations merged into the completed crimes of theft, with the result that consecutive sentences for false claims and theft were improper.

This approach, though for a short while in vogue in this circuit,[32] assumes an erroneous premise. The Supreme Court has consistently indicated that *Blockburger* calls for comparison of the statutorily-prescribed elements of the offenses, not the constituent facts either as alleged or proven.[33] The Court has stated unqualifiedly that "application of the [*Blockburger*] test focuses on the statutory elements of the offense";[34] it has emphatically disavowed an attempt to apply the test "to the facts alleged in a particular indictment";[35] and it has declared that "[i]f each [offense] requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes."[36] We ourselves have now settled on that

---

but discussion of those inconsistencies did not center on congressional intent respecting multiple punishments, but instead on the consideration that "some [crimes] appeared too lenient and others too harsh when compared with crimes of similar gravity. . . . [S]erious disparities in punishments were discovered when the nature of various crimes were considered." *Id.* So it was that the theft section was rewritten to consolidate the scattered provisions proscribing theft of Government property, and the penalties were graduated, depending on severity of the offense, "as more in conformity with the later congressional policy." *Id.* at A54–A55. Revisions of the false claims section included removal of material relating to false statements, which became 18 U.S.C. § 1001 (1982), and a decrease in the maximum term of imprisonment from ten years to five. *Id.* at A25. So, while the two sections were revised concurrently, the legislative history is silent as to an interrelationship between the crimes they respectively defined, and as to whether consecutive sentences for their commission were thought to be permissible.

**31.** See text *supra* at note 25.

**32.** See *United States v. Sampol,* 204 U.S.App. D.C. 349, 636 F.2d 621 (1980) (per curiam), invalidating consecutive sentences for misprison of a felony and making false statements to a grand jury, where proof of the false statements sufficed also to establish all elements of the misprison charge. But see note 37 *infra.*

**33.** See the discussion in *Whalen v. United States, supra* note 18, 445 U.S. at 710–711, 100 S.Ct. at 1447–1448, 63 L.Ed.2d at 736–737 (dissenting opinion).

**34.** *Iannelli v. United States,* 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616, 627 n. 17 (1975).

**35.** *Whalen v. United States, supra* note 18, 445 U.S. at 694 n. 8, 100 S.Ct. at 1439 n. 8, 63 L.Ed.2d at 725 n. 8.

**36.** *Brown v. Ohio, supra* note 17, 432 U.S. at 166, 97 S.Ct. at 2225–2226, 53 L.Ed.2d at 194, quoting *Iiannelli v. United States, supra* note 34, 420 U.S. at 785 n. 17, 95 S.Ct. at 1284 n. 17, 43 L.Ed.2d at 627 n. 17.

course as the methodology for applications of *Blockburger*.[37]

 Proceeding, then, in that direction, our analysis of the false claims and theft statutes reveals that *Blockburger* tolerates the consecutive sentences levied in this case. An essential element of false claims is that the accused has presented a claim knowing it to be false, fictitious or fraudulent,[38] but there is no requirement that the claim has actually been honored.[39] Theft of governmental property, on the other hand, is essentially larceny from the Government,[40] and contrasts with false claims in that the accused must actually have succeeded in wrongfully separating the Government from its money or other valuables.[41] Unlike false claims, however, theft from the Government need not be accomplished by false pretenses or other fraudulent means.[42] Since each of these offenses thus incorporates elements which are not components of the other, *Blockburger* presumes that Congress intended to permit cumulative punishments.[43] It fol-

---

**37.** In *United States v. Bridges,* 230 U.S.App. D.C. 387, 393, 717 F.2d 1444, 1450 (1983), we declared that *Albernaz v. United States, supra* note 16, "sheds new light on *Sampol," supra* note 32, "and effectively overrules it." 230 U.S.App.D.C. at 393, 717 F.2d at 1450. We said that "[s]ince *Albernaz,* the approach of *Sampol* is untenable," *id.* at 394, 717 F.2d at 1451, and that

> [t]he lodestar must be the intent of Congress. The court's application of *Blockburger* must look to what Congress has said; the court's application of Congress' intent ought not be led astray by the happenstance of what evidence comes before the court.

*Id.* at 393, 717 F.2d at 1450.

**38.** *United States v. Precision Medical Laboratories, Inc.,* 593 F.2d 434, 443 (2d Cir.1978); *United States v. Miller,* 545 F.2d 1204, 1212 n. 10 (9th Cir.1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977).

**39.** *United States v. Miller, supra* note 38, 545 F.2d at 1212 n. 10 (filing of a false tax return pursuant to a scheme to obtain an unjustified tax refund is itself sufficient to establish a false claims violation under § 287); *see also United States v. Lopez,* 420 F.2d 313, 315 (2d Cir. 1969); *Kercher v. United States,* 409 F.2d 814, 818 (8th Cir.1969).

**40.** *United States v. Wilson,* 636 F.2d 225, 226 (8th Cir.1980) (conviction under § 641 requires proof of a criminal intent to steal).

**41.** *United States v. Evans,* 572 F.2d 455, 471 (5th Cir.), *cert. denied sub nom. Tate v. United States,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978) (Government must establish actual property loss under § 641).

**42.** *United States v. DiGilio,* 538 F.2d 972, 978 (3d Cir.1976), *cert. denied sub nom. Lupo v. United States,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977) (wrongful appropriation of Government property of value is sufficient to establish prima facie case of § 641 violation).

**43.** Similarly, examination of the mail fraud section satisfied us that Congress intended to al-low multiple punishments for conduct trenching both on it and the false claims section. The mail fraud section specifies:

> Whoever, having devised ... any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice ..., places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341 (1982). This provision is facially unambiguous in its specification of the penalty for conduct violative of its terms, and the legislative history yields no indication of a purpose to limit its imposition simply because the same conduct constitutes another crime. Moreover, applying the *Blockburger* test, the proper conclusion becomes clear. The offense of mail fraud demands proof of a scheme to defraud which, at some point, is intentionally furthered by use of the mails. *United States v. Rodgers,* 624 F.2d 1303, 1306 (5th Cir.1980), *cert. denied sub nom. Anthony J. Bertucci Constr. Co. v. United States,* 450 U.S. 917, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981); *United States v. Azzarelli Constr. Co.,* 612 F.2d 292, 298 (7th Cir.1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *DeMier v. United States,* 616 F.2d 366, 369 (8th Cir. 1980); *United States v. White,* 673 F.2d 299, 302 (10th Cir.1982). The focus of the statute thus is upon misuse of the mails in aid of a fraudulent scheme. *United States v. Alston,* 197 U.S.App.D.C. 276, 281, 609 F.2d 531, 536 (1979), *cert. denied,* 445 U.S. 918, 100 S.Ct. 1281, 63 L.Ed.2d 603 (1980). No particular type of victim is required, however, *United States v. Diggs,* 198 U.S.App.D.C. 255, 613 F.2d

lows that the District Court's imposition of consecutive sentences produced neither a constitutional nor a statutory infraction.

The judgment appealed from is accordingly

*Affirmed.*

988 (1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980) (federal agency); *United States v. Drury,* 687 F.2d 63 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2119, 77 L.Ed.2d 1300 (1983) (attorney's clients); *United States v. Shryock,* 537 F.2d 207 (5th Cir.1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977) (automobile purchasers); *United States v. Morrow,* 537 F.2d 120 (5th Cir.1976), *cert. denied sub nom. Martin v. United States,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977) (federally insured bank); *United States v. Reicin,* 497 F.2d 563 (7th Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974) (insurance company), nor need the scheme have succeeded. *United States v. Pearlstein,* 576 F.2d 531, 542 (3d Cir. 1978); *United States v. Martino,* 648 F.2d 367, 399 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982); *United States v. Lemm,* 680 F.2d 1193, 1205 (8th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983); *DeMier v. United States, supra,* 616 F.2d at 369. The false claims statute, on the other hand, obviously seeks to protect an entirely different interest—that in property of the Government. Like mail fraud, a false claim conviction must be based on proof that the accused undertook a fraudulent

scheme. *United States v. Cooperative Grain and Supply Co.,* 476 F.2d 47, 56 (8th Cir.1973); *Kercher v. United States, supra* note 39, 409 F.2d at 818; *United States v. Computer Sciences Corp.,* 511 F.Supp. 1125, 1134 (E.D.Va. 1981), *rev'd on other grounds,* 689 F.2d 1181 (4th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). It differs from mail fraud, however, in that the claim must have actually been presented to the Government, and that use of the mails is not a necessary component. *Johnson v. United States,* 410 F.2d 38, 46 (8th Cir.), *cert. denied,* 396 U.S. 822, 90 S.Ct. 63, 24 L.Ed.2d 72 (1969). Thus, the two statutes are directed at separate evils, proscribe different acts and require proof of different elements. We think Congress rather plainly authorized additional sanctions for abuse of the mails in connection with a scheme to defraud which is itself punishable under a separate statute, see *United States v. Alston, supra,* 197 U.S.App.D.C. at 280–281, 609 F.2d at 535–536; *United States v. Mahler,* 579 F.2d 730, 731 n. 2 (2d Cir.), *cert. denied,* 439 U.S. 991, 99 S.Ct. 592, 58 L.Ed.2d 666 (1978); *United States v. Weatherspoon,* 581 F.2d 595, 600 (7th Cir.1978), and therefore, there is no occasion to resort to the doctrine of lenity. See note 26 *supra.*